## UNITED STATES OF AMERICA
### DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

SHARLENE DESKINS,
PO Box 1401
Greenbelt, MD 20706

   Plaintiff,


  v.


SONNY PERDUE,
SECRETARY OF AGRICULTURE,
U.S. Department of Agriculture
1400 Independence Ave., S.W.
Washington, DC 20250

   Defendant

Case: 1:18-cv-03147  (H-DECK)
Assigned To : Walton, Reggie B.
Assign. Date : 12/31/2018
Description: Employ. Discrim (JURY)


Hon.


**JURY TRIAL DEMANDED**

### COMPLAINT

1. Plaintiff Sharlene Deskins hereby files this Complaint against Secretary of Agriculture Sonny Perdue, in his official capacity only, and the Department of Agriculture for violation of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* and the Whistleblower Protection Act and Whistleblower Protection Enhancement Act, 5 U.S.C. § 2302(b)(8).

2. Defendant engaged in unlawful discrimination against Ms. Deskins based on sex (female) and race (African American) when it subjected her to harassment and a hostile work environment as detailed below, reprimanded her twice, suspended her twice, and ultimately terminated her

employment on March 14, 2018 based upon alleged poor performance pursuant to 5 U.S.C. § 4303.

3.    Defendant also unlawfully committed a Prohibited Personnel Practice when it removed Ms. Deskins from federal service in retaliation for her complaints of violations of the Anti-deficiency Act because she reasonably believed that the Department of Agriculture was engaged in unlawful activity by misusing federal appropriations to facilitate the unlawful operation of commercial food truck operations by the Potato Board, which is overseen by her then client, the Agricultural Marketing Service (AMS).

4.    Ms. Deskins is seeking relief in the form of retroactive reinstatement with full back pay and benefits, the maximum compensatory damages allowed by law, a clean record, posting of notices, and the reasonable attorney fees and expenses of bringing this case.

5.    Ms. Deskins respectfully requests trial by jury on all issues triable before a jury.

## PARTIES

6.    Plaintiff Sharlene Deskins was formerly a GS-15 Staff Attorney in the Office of the General Counsel (OGC) of the United States Department of Agriculture (USDA) in Washington, DC, where she served from 1990 until March 14, 2018. Ms. Deskins resides in Seabrook, MD 20706. Ms. Deskins' mailing address is P.O. Box 1401, Greenbelt, MD 20706. Ms. Deskins is an African American woman.

2

7.   Defendant Sonny Perdue is the United States Secretary of Agriculture and is sued in his official capacity only. Mr. Perdue has ultimate authority over USDA. His address is the United States Department of Agriculture, 1400 Independence Ave., S.W., Washington, DC 20250.

## JURISDICTION

8.   This court has jurisdiction because this case is brought pursuant to federal law, 28 U.S.C. § 1331, and the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f)(3).

9.   Ms. Deskins has exhausted her administrative remedies in *Sharlene Deskins v. Secretary of Agriculture*, EEOC No. 570-2016-01360X, Agency No. CSRD-2015-00669 by timely contacting a USDA Equal Employment Opportunity (EEO counselor), filing a formal EEO complaint of discrimination, and request for an Equal Employment Opportunity Commission (EEOC) hearing. This case is currently pending before the EEOC's Washington Field Office. *See* 29 C.F.R. § 1614 Subpart A. More than 180 days have passed since Ms. Deskins filed her individual EEO complaint, and no final action or appeal has been taken. Ms. Deskins now files this Civil Action pursuant to 29 C.F.R. § 1614.407(b).

10.   Ms. Deskins has exhausted her administrative remedies in *Sharlene Deskins v. Secretary of Agriculture*, Agency No. DEPT-2017-00535 by timely contacting a USDA Equal Employment Opportunity (EEO counselor), filing a formal EEO complaint of discrimination, and request for an Equal Employment Opportunity Commission (EEOC) hearing. This case

3

is currently pending before the EEOC's Washington Field Office. *See* 29 C.F.R. § 1614 Subpart A. More than 180 days have passed since Ms. Deskins filed her individual EEO complaint, and no final action or appeal has been taken. Ms. Deskins now files this Civil Action pursuant to 29 C.F.R. § 1614.407(b).

11.    Ms. Deskins exhausted her administrative remedies when she timely challenged her removal from federal service pursuant to 5 U.S.C. § 4303 at the Merit Systems Protection Board (MSPB) in *Sharlene Deskins v. Department of Agriculture,* Appeal No. DC-0432-18-0450-I-1, and asserted affirmative defenses of discrimination based on sex, race,  and unlawful reprisal for protected EEO activity. *See* 5 U.S.C. § 7703(b)(2). Ms. Deskins also asserted an affirmative defense for protected whistleblower activity. *See* 5 U.S.C. §  2302(b)(8). Ms. Deskins now files this complaint pursuant to 5 U.S.C. §§ 7702-7703 and 5 U.S.C. § 1221 within 30 days of the Merit Systems Protection Board's Final Decision following a decision on December 3, 2018.

## VENUE

12.    Venue is proper in this court because this both the district in which Ms. Deskins worked and the Defendant's principal office. 42 U.S.C. § 2000e-5(f)(3); 28 U.S.C. § 1391(e)(1).

### REQUEST FOR WAIVER OF FEES
### AND APPOINTMENT OF COUNSEL

13.    Despite diligently seeking new employment, Ms. Deskins has remained unemployed since her termination on March 14, 2018 and the

4

Office of Personnel Management (OPM) has determined that she is not at this time eligible to receive her federal pension. Ms. Deskins therefore has minimal financial resources and is unable to pay for counsel.

14.    Ms. Deskins therefore respectfully requests that the Court appoint counsel and waive prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f)(1); 29 U.S.C. § 794a.

## Facts

15.    Plaintiff Sharlene Deskins worked in that General Counsel's office at the United States Department of Agriculture from September 24, 2009 until March 16, 2018, as a GS-0905-15, Senior Counsel, assigned to MRFSPD, OGC in Washington, DC.

16.    On September 04, 2012, the USDA Office of the General Counsel issued an Electronic Case Management (ECM) policy restricting docketing entries to ECM.

17.    In 2013, Ms. Deskins' first-line supervisor Carrie Ricci started to criticize Sharlene Deskins' performance in 2013 after she first began making complaints to her managers about discrimination based on her race, sex, and age.

18.    Ms. Ricci is an African American and Hispanic woman with no prior EEO activity.

19.    Beginning in May 2014, Mai Dinh, Assistant General Counsel,

5

MRFSPD, became Ms. Deskins' first line supervisor, and Carrie Ricci, Associate General Counsel, became her second-line supervisor.

20.     Ms. Dinh is an Asian American woman with no prior EEO activity.

21.     Beginning in 2014 and continuing thereafter, Mai Dinh assigned GS-15 work to lower-graded white employees and GS-11 to GS 12 work to Sharlene Deskins.

22.     On June 26, 2014, Sharlene Deskins wrote, as she had done previously, to Mai Dinh to complain about discriminatory working conditions.

23.     On or about February 2015, Ms. Deskins again expressed concern to Ms. Dinh regarding Ms. Dinh's discriminatory and harassing actions.

24.     In April 2015, Ms. Deskins made a request to be detailed out of OGC because of the hostile work environment to which she was being subjected.

25.     Her supervisors agreed to send her on a detail, but then delayed the detail for months.

26.     On April 6, 2015, Ms. Deskins attempted to mediate her concerns over discrimination with Ms. Dinh through the USDA mediation office, but instead Ms. Dinh threatened her with an unsatisfactory performance rating.

27. On April 17, 2015, Ms. Dinh issued Ms. Deskins an alleged summary of the mediation that again threatened her with an unsatisfactory performance rating.

28. Ms. Dinh also sent her performance review to the mediator at the April 6 meeting without Ms. Deskins' prior knowledge or consent.

29. On April 20, 2015, Sharlene Deskins filed her first-step informal grievance under the Collective Bargaining Agreement (CBA) over Ms. Dinh's discriminatory and retaliatory actions in refusing to mediate with her and instead conducting an impromptu and threatening performance review.

30. On a number of occasions, Ms. Dinh and Ms. Ricci engaged in physically or verbally threatening behavior toward Ms. Deskins including but not limited to raising their voices, wagging their fingers in her face, and putting their hands in her face, and running toward her in a hostile, threatening manner as they yelled at her.

31. On approximately April 29, 2015, Ms. Deskins also first raised concerns about her personal safety in light of Ms. Dinh and Ms. Ricci's hostile and threatening conduct.

32. On May 12, 2105, Ms. Dinh issued Ms. Deskins a proposed letter of reprimand for conduct unbecoming a federal employee on the pretext that Ms. Deskins had missed a meeting but in reality, in retaliation for Ms. Deskins' continued opposition to Ms. Dinh's discriminatory actions.

33.    On June 2, 2015, Ms. Dinh issued Ms. Deskins a Letter of Reprimand on the pretext that Ms. Deskins had missed a meeting.

34.    On or about June 15, 2015, Ms. Dinh became aware that Ms. Deskins had filed an EEO complaint.

35.    On July 16, 2015, Ms. Dinh then continued her campaign of retaliation by proposing to suspend Ms. Deskins for five-days.

36.    Ms. Dinh asserted as a reason for the proposed suspension that Ms. Deskins had made unauthorized scheduling changes in her biweekly report.

37.    In fact, Ms. Dinh had authorized Ms. Deskins to make changes prior to Ms. Deskins' submission of her biweekly report.

38.    In requiring Ms. Deskins to submit biweekly reports, Ms. Dinh was in violation of the Department's written Electronic Case Management (ECM) policy.

39.    Because Ms. Dinh's biweekly report was in violation of Departmental policy, Ms. Dinh had no legitimate basis for disciplining Ms. Deskins.

40.    In early to mid-July 2015, Ms. Deskins asked Ms. Dinh to provide her with a hearing schedule for the California Milk Marketing Order hearings so that Ms. Deskins could adjust her personal schedule.

41.    Instead of providing Ms. Deskins with the schedule she requested, Ms. Dinh removed Ms. Deskins from the California Milk

8

Marketing Order on or about July 31, 2015 in retaliation for her EEO complaint.

42.    In light of the continuing hostile and threatening treatment she was receiving from Ms. Dinh, Ms. Deskins raised concerns about her personal safety with Ms. Ricci in July of 2015, and a number of times thereafter, concerns that were never properly addressed.

43.    On or about September 3, 2015, Ms. Ricci again refused to send Ms. Deskins on her promised detail on the pretext that Ms. Ricci needed to assign her a new case.

44.    Assigning this new case was clearly a pretext for retaliating and discriminating against Ms. Deskins because the new case required her to travel, contradicting the Agency's assertion that it removed Ms. Deskins from the California Milk Marketing Order because she could not travel.

45.    On September 8, 2015, Ms. Ricci issued Ms. Deskins a 3-day suspension based on Ms. Dinh's proposal that she be suspended for five days.

46.    On September 13, 2015, Ms. Dinh removed another one of Ms. Deskins' high-profile cases, *Dillenberg v. HSUS*, and reassigned it to another employee in further retaliation for Ms. Deskins' protected EEO activity.

47.    On September 14, 2015, Ms. Deskins' supervisors told her again that the detail they promised her would be further delayed.

9

48. On September 28, 2015, Sharlene Deskins was cautioned on being at risk of not meeting the fully successful level of performance for three Critical Elements.

49. Ms. Deskins made repeated attempts to obtain access to supervisory records related to her alleged poor performance through the Freedom of Information Act (FOIA) and other means including the disclosure requirements in the CBA.

50. Ms. Deskins requested these records in an attempt to better understand the rationale behind her supervisors' relentless criticism, which continually blamed her for failure to understand unclear assignments and address contradictory deadlines.

51. On September 28, 2015, Carrie Ricci stated that she believed Mai Dinh made reasonable attempts to authorize Sharlene Deskins' access to the supervisory records that Ms. Deskins had requested under the Freedom of Information Act, and that her efforts were consistent with the applicable section of the CBA.

52. Ms. Dinh and Ms. Ricci's refused to provide Ms. Deskins with adequate guidance regarding assignments and expectations in retaliation for her EEO activity in order to undermine Ms. Deskins' performance and use it as a basis for taking action against her.

53. On October 27, 2015, following a management inquiry, Malcolm Shorter issued a report in which he found no grounds for the genuine

concerns for her personal safety that Ms. Deskins had been raising since April of that year.

54.     On April 11, 2016, Ms. Dinh provided an Affidavit to the EEO investigator in Ms. Deskins first EEO complaint.

55.     On May 24, 2016, Ms. Ricci provided an Affidavit to the EEO investigator in Ms. Deskins' first EEO complaint.

56.     From May 2016 to February 2017, Ms. Deskins was detailed first to the Coast Guard and then to the Combined Federal Campaign (CFC).

57.     During the time that Ms. Deskins was on her details, Ms. Dinh and Ms. Ricci had no further opportunities to harass, retaliate, or discriminate against her until they required her to return prematurely from her final detail.

58.     In anticipation of Ms. Deskins' return to USDA from her second detail at the Combined Federal Campaign (CFC), Ms. Dinh gave her new assignments, but these assignments were a diminution of her prior responsibilities.

59.     On February 6, 2017, Mai Dinh assigned Sharlene Deskins to work on dairy and specialty crops after returning from her CDC detail.

60.     However, on February 14, 2017, Ms. Dinh removed Ms. Deskins from her Team Leader position for Specialty Crops.

11

61.    On February 22, 2017, Mai Dinh ended Sharlene Deskins' detail to the Combined Federal Campaign two-days early, so that she was unable to complete her work there.

62.    On February 22, 2017, Mai Dinh assigned Sharlene Deskins cases that were below her grade level and no longer supervised by Ms. Dinh.

63.    Moreover, Ms. Dinh threatened to mark Ms. Deskins Absent Without Leave (AWOL) if she did not appear in person on February 23, 2017, even though it was Ms. Deskins' telework day.

64.    On February 23, 2017, Peggy Javery sent Sharlene Deskins a letter of thanks for her service to the Combined Federal Campaign (CFC).

65.    In the first of two conversations with Ms. Ricci on February 23, 2017, Ms. Deskins went to Ms. Ricci's office to discuss Ms. Ricci and Ms. Dinh's discriminatory treatment and her premature recall from her detail, which left her unable to complete her work before she left.

66.    Ms. Ricci refused to listen to Ms. Deskins and instead began to approach Ms. Deskins in a threatening manner.

67.    Ms. Ricci later accused Ms. Deskins of raising her voice, which Ms. Deskins denies.

68.    Seeking to avoid confrontation, Ms. Deskins left the office and called security out of concern for her safety and in the interest of having a witness should Ms. Ricci make any unfounded accusations against her. Ms.

12

Ricci and Ralph Linden sent Ms. Deskins emails ordering her to cease and desist on or about February 23, 2017.

69. Later that day, Ms. Ricci came to Ms. Deskins' office and confronted her.

70. On March 6, 2017, Sharlene Deskins filed a new informal EEO complaint of discrimination and retaliation.

71. That same day, March 6, 2017, Ms. Dinh and Kevin McGrath scheduled a meeting with Ms. Deskins on Ms. Deskins' telework day to deliver a proposed 14-Day suspension, based on Ms. Deskins' alleged misconduct on February 22 and February 23, 2017.

72. Ms. Dinh did not give Ms. Deskins reasonable notice in advance of the meeting.

73. On May 18, 2017, Ms. Dinh again attempted to sabotage Ms. Deskins' by imposing unreasonably short deadlines and refusing her assistance.

74. On June 1, 2017, Ms. Dinh further curtailed Ms. Deskins' duties when she removed her from another Dairy Program and accused of providing a legal opinion to an Agency when she was not authorized to do so.

75. Ms. Deskins was charged with four instances in which she allegedly raised her voice at her supervisor, requested that security be called, and asked that a conversation with her supervisor take place before a witness in the HR office.

76. On June 8, 2017, Associate General Counsel David Grahn issued a decision imposing a nine-day suspension on Ms. Deskins from June 11, 2017 to June 19, 2017, for allegedly engaging in misconduct on February 22 and February 23, 2017, after Ms. Deskins went to Ms. Ricci's office to protest her supervisors' discriminatory treatment.

77. On June 11, 2017, Sharlene Deskins began serving her nine-day suspension.

78. On June 15, 2017, Sharlene Deskins filed a new formal EEO complaint of discrimination and retaliation.

79. On June 16, 2017, Mai Dinh denied Sharlene Deskins' request for sick leave from June 20 to June 22, 2017.

80. While Ms. Deskins was suspended, Ms. Dinh sent six memoranda to Ms. Deskins' home address ordering her to work before she would grant Ms. Deskins' request for sick leave.

81. Ms. Dinh's contact with Ms. Deskins was inappropriate because Ms. Deskins was neither expected nor allowed to work while she was suspended. Ms. Deskins did respond to Ms. Dinh's order to work and did perform job duties while suspended in order to have her sick leave requests granted.

82. On June 29, 2017, the Agency partially accepted Sharlene Deskins' series of allegations of discrimination and retaliation, which included but were not limited to her nine-day suspension.

14

83.    In July 2017, Ms. Deskins' supervisor assigned her to investigate the legality of and authority for operation of commercial food trucks by the Potato Research Board under the supervision of the Agricultural Marketing Service (AMS).

84.    In July 2017, Sharlene Deskins first raised concerns orally about the operation of food trucks by the Potato Research Board under 7 USC 2611 et seq.   See also www.foodrepublic.com/2016/01/26/u-s-potato-board-fires-up-500-food-trucks-to-sell-more-spuds.

85.    In July of 2017, Mai Dinh put Ms. Deskins on a PIP right after the close of her EEO investigation in June 2017 and after she returned to work from the suspension, sick leave, vacation and jury duty.

86.    On or about July 2017, Ms. Dinh ordered Ms. Deskins not to communicate with her colleague Will Francis unless Ms. Dinh was present thus interfering with Ms. Deskins' ability to carry out her assigned work.

87.    On July 9, 2017, Mai Dinh denied Sharlene Deskins' request for compensatory time so that she could work extra hours on the In re Summer Wind Consent Decree.

88.    The Agency imposed a nine-day suspension on Ms. Deskins beginning June 11, 2017

89.    On July 17, 2017, Mai Dinh met with Ms. Deskins and  notified Ms. Deskins that she was putting her on a Performance Improvement Plan (PIP) shortly after the close of Ms. Deskins' EEO investigation.

15

90.    Following her issuance of the PIP, Ms. Dinh assigned Ms. Deskins a number of administrative cases that were below her GS-15 grade level and then again sabotaged Ms. Deskins' performance by refusing to give her access to the case files.

91.    Union representative Alan Groesbeck, who was also present at the July 17, 2017 meeting informed Ms. Dinh that the Agency's PIP was in violation of Article 38 of the Collective Bargaining Agreement because the Agency had not given the union prior notice of the proposed PIP and an opportunity to have input.

92.    Ms. Dinh failed to write the PIP in such a manner that Ms. Deskins could understand what was required to bring her performance up to the fully successful level as required by DR-4040-430.

93.    On July 23, 2017, Will Francis asked Sharlene Deskins if AMS may issue a letter in support of a private company's litigation to which the United States it is not a party.

94.    Ms. Deskins was not able to respond to this request because Ms. Dinh had told her she did not have permission to communicate with Mr. Francis unless Ms. Dinh was present.

95.    During the month July 2017, Sharlene Deskins negotiated the In re Summer Wind Consent Decree over the course of several weeks.

96.    Ms. Deskins performed virtually all of the work necessary to negotiate the agreement.

16

97.    The role of Ms. Deskins' supervisor Mai Dinh was limited to clarification of one term of the Agreement.

98.    On July 24, 2017 at 4:15 p.m., Ms. Deskins sent an email indicating that she had accepted the changes to the proposed consent decree and was forwarding it to the respondent in that case.

99.    On July 24, 2017 at 5:04 p.m., Ms. Deskins sent an email indicating that a final agreement had to be sent to the respondent, but that she could not stay past 5:30 p.m. unless she were granted permission to use compensatory time so that she could continue to work on the settlement.

100.    Ms. Deskins reasonably believed that she was not permitted to continue work after 5:30 p.m. if the Agency did not approve compensatory time or overtime.

101.    On July 24, 2017 at 5:21:00 PM, Sharlene Deskins again sent an email to Mai Dinh that indicated that In re Summer Wind could be settled with Ms. Dinh's approval.

102.    Ms. Deskins kept Ms. Dinh informed of her progress throughout the Summer Wind discussions, and Ms. Dinh was fully aware of the need for her to take over after 5:30 p.m.

103.    On or about 5:30 p.m. Sharlene Deskins sent an email copying Mai Dinh and Carrie Ricci indicating that Summer Wind had not settled, and she was leaving.

17

104.   On July 24, 2017, Mai Dinh claimed that she settled In re: Summer Wind, when in fact it was Sharlene Deskins who did the work and signed the Agreement.

105.   Ms. Dinh played a minor role after Sharlene Deskins had to leave the office because Dinh would not grant compensatory time or overtime for Ms. Deskins to stay after her normal duty hours, and Ms. Deskins was concerned that she would be in violation of the Anti-deficiency Laws if she continued to work without compensation.

106.   On July 24, 2017 at 6:37 p.m., USDA issued a consent decision in the Summer Wind case.

107.   On July 24, 2017 at 7:25 p.m. PM, Mai Dinh sent an email memorializing settlement of the Summer Wind decision.

108.   On July 25, 2017, Sharlene Deskins signed the final agreement in In re Summer Wind at the hearing which was held by the Administrative Law Judge.

109.   Mai Dinh subsequently claimed that she settled In re Summer Wind, when in fact it was Sharlene Deskins who did the work and signed the Agreement. Mai Dinh played a minor role after Sharlene Deskins had to leave the office.

110.   In August 2017, Ms. Deskins again raised concerns about violation of the Anti-deficiency Laws and waste, fraud and abuse of the use of assessments that should be reported to USDA OIG.

111.   Ms. Deskins also raised concerns that under the Internal Revenue Code, that the Potato Research Board should be paying taxes on sales made by the food trucks.

112.   On August 7, 2017, Sharlene Deskins attended a meeting called by Ms. Dinh to discuss several Supreme Court cases.

113.   At the meeting on August 7, 2017, Ms. Deskins stated that under United Foods v. USDA, research was not covered by a challenge to the promotion authority of a research and promotion board.

114.   Ms. Dinh twice responded that Ms. Deskins was wrong and subsequently cited Ms. Deskins' statement as a performance failure on Ms. Deskins' part.

115.   In August 2017, Patrice Harps asked Ms. Deskins to provide legal authority for modification of provisions in the Federal Register.

116.   However, Ms. Harps directions were unclear, but when Ms. Deskins asked for clarification, her supervisors held it against her as a performance failure.

117.   On August 03, 2017, Mai Dinh wrote to Sharlene Deskins that her legal advice at the dairy programs meeting was insufficient, to which Ms. Deskins responded disputing Ms. Dinh's assertions and again raising concerns about discrimination and retaliation.

118.   On August 2, 2017, Mai Dinh again raised the issue of whether the Potato Board had the legal authority to operate commercial food trucks

and criticized Sharlene Deskins' performance at the performance review meeting because Ms. Deskins could not find authority to justify AMS's unlawful operation of food trucks.

119.    On August 4, 2017, Melissa Bailey complained about Sharlene Deskins' alleged bullying of AMS employees for asking questions about the Potato Food trucks and inquiry about who originally approved the operation of the food trucks.

120.    On August 30, 2017, Mai Dinh again accused Sharlene Deskins of poor performance when she confirmed that there was no statutory authority for operating food trucks and indicated that the Potato Board was also unaware of any authority.

121.    Subsequently in August of 2017, Ms. Deskins again complained to her supervisors about violation of the Anti-deficiency Laws and waste, fraud and abuse in the use of assessments.

122.    Ms. Deskins was also concerned about potential violations of the IRS Code based on her belief that AMS was not requiring the Potato Board to report income from the food truck operation.

123.    Ms. Deskins requested that the continued support of the Agricultural Marketing Service for the Potato Board's food truck program, which Ms. Deskins reasonably believed to be unlawful, be reported to the General Law Division of the Office of the General Counsel, which normally deals with potential violations of the Anti-deficiency laws.

20

124. Ms. Deskins also requested that her supervisors contact the Office of the Inspector General (OIG) regarding potential misuse of assessments.

125. Ms. Deskins, who is not an expert either in the Anti-deficiency laws or in tax law, reported these concerns directly to her supervisors rather than reporting them herself in the hopes that they would review her concerns and provide some justification for the legality of the actions of AMS and the Potato Board.

126. Ms. Deskins received no response to the concerns she repeatedly raised about potentially unlawful activity.

127. Based on her supervisors' refusal to seek further review of her concerns regarding potentially unlawful activity, Ms. Deskins continued to be reasonably concerned that these activities were not lawful.

128. On August 31, 2017, Ms. Deskins warned the Agency by email that the Potato Board's operation of food trucks was a violation of the Anti-deficiency Laws  and also misuse of assessments that should be reported to the USDA Office of the Inspector General.

129. Ms. Deskins reasonably believed that the Potato Board was in violation of the law by operating  commercial food trucks.

130. Operating a commercial food truck is not specifically authorized by the Potato Research and Promotion Act.

21

131.   Ms. Deskins requested that violations of the Anti-deficiency laws be reviewed by the OGC General Law Division, the Office of Inspector General, and GAO (General Accountability Office).

132.   The only action that Ms. Ricci took was to send Ms. Deskins' inquiry to Benjamin Young. Mr. Young gave no response and took no action.

133.   In August 2017, Ms. Dinh also asked Ms. Deskins for an opinion as to whether AMS was authorized to issue a letter in support of a private company's litigation in an administrative proceeding to which USDA was not a party.

134.   Ms. Deskins responded that she could not find any legal authority for such an intervention.

135.   On August 9, 2017, Mai Dinh issued an email claiming — on the basis of scant statutory authority — that AMS had authority to issue such a letter.

136.   However, Ms. Dinh conceded there is "no authority outright" to issue such a letter.

137.   Mai Dinh provided an example of a "legal analysis" purporting to justify the Agency's intervention based on the general statement of purpose in the Agriculture Marketing Act of 1946.

138.   On August 11, 2017, Mai Dinh relieved Sharlene Deskins of further work on an AMS dairy question after Ms. Deskins requested clarification about unclear instructions.

139.   In August 2017, Patrice Harps asked Ms. Deskins to provide her with a memorandum regarding the procedure for modifying federal regulations.

140.   On August 16, 2017, Sharlene Deskins sent Patrice Harps an email memorandum responding to her questions about revising federal regulations.

141.   Ms. Harps repeatedly failed to provide Ms. Deskins with clear instructions, and then subsequently accused Ms. Deskins of poor performance for her difficulties in following them because of Ms. Harps' failure to provide clear guidance.

142.   Ms. Deskins' supervisors created impossible working conditions with the intention of forcing Ms. Deskins' out of the Agency because of her EEO complaints and her exposure of potentially unlawful activity.

143.   Ms. Deskins' supervisors repeatedly sabotaged Ms. Deskins' performance by subjecting her to supervision by four different supervisors, making it unclear to whom Ms. Deskins was accountable during her PIP.

144.   In approximately 2016, Ms. Deskins' immediate supervisor Mai Dinh was removed from supervision of cases involving the Animal Welfare Act (AWA) and the Horse Protection Act (HPA).

145.   Ms. Deskins' second-line supervisor, Carrie Ricci, began issuing the assignments in the AWA and HPA cases.

23

146.   However, Ms. Deskins was expected to report to yet another supervisor, Sheila Novak, on the conduct and progress of those cases.

147.   Ms. Deskins repeatedly asked to be reassigned out of the Office of General Counsel beginning in 2015 when Ms. Dinh began a regular practice of discrimination and retaliation.

148.   On August 21, 2017, Patrice Harps sent Sharlene Deskins an email with a summary of her August 16, 2017 performance review meeting with Ms. Deskins.

149.   On August 30, 2017, Sharlene Deskins attempted to present her response to the PIP to Patrice Harps and Carrie Ricci, who refused to accept it.

150.   On September 05, 2017, Patrice Harps issued a performance review to Sharlene Deskins.

151.   On September 11, 2017, Sharlene Deskins met expectations for the Dairy Program meeting.

152.   On September 11, 2017, Sharlene Deskins again reviewed the law regarding the operation of food trucks and provided Mai Dinh and Carrie Ricci with a detailed four-page memorandum outlining the ways in which in her legal opinion the Potato Board was in violation of the Anti-deficiency laws and would require the Board to report income and pay taxes to the IRS.

24

153.    Ms. Dinh responded that Ms. Deskins did not provide a sufficient legal analysis in her memorandum on how the Potato Board's activities were not authorized by the Anti-Deficiency Act.

154.    Ms. Deskins raised concerns that she was not allowed to work independently.

155.    Later on September 11, 2017, Carrie Ricci sent Benjamin Young, an attorney in the General Law Division, a copy of Sharlene Deskins' report on the Anti-deficiency laws.

156.    However, Ms. Ricci never told Ms. Deskins that she had forwarded the email, and neither she nor Mr. Young responded to Ms. Deskins' email.

157.    On September 13, 2017, Patrice Harps sent an email redlining Sharlene Deskins' email on the Potato Board.

158.    On September 13, 2017, Alan Groesbeck notified Mai Dinh he could not attend that day's performance meeting.

159.    On September 19, 2017, Mai Dinh issued a memo to Sharlene Deskins purporting to summarize her performance feedback.

160.    On September 27, 2017, Mai Dinh and Sharlene Deskins exchanged emails regarding Ms. Deskins' request to have her union representative present.

161. Ms. Dinh responded that she would not reschedule meetings so that a union representative could be present, but she informed Ms. Deskins that meetings are voluntary.

162. On September 27, 2017, Carrie Ricci issued an email about a meeting on October 5, 2017, which she requested that Ms. Deskins attend.

163. Unfortunately, Ms. Deskins did not see the request that she attend in person before the meeting, and she was unsuccessful when she tried to call in.

164. Ms. Ricci counted Ms. Deskins inadvertent absence from a meeting at which she did not know she was expected to appear personally as a performance failure.

165. On September 28, 2017, Mai Dinh emailed Sharlene Deskins regarding her latest observations on Ms. Deskins' performance.

166. Ms. Dinh criticized Ms. Deskins for not responding immediately to an email that Ms. Dinh had sent while Ms. Deskins was not at work.

167. On October 2, 2017, Sharlene Deskins responded to Mai Dinh and Patrice Harps' performance feedback from September 7, 2017.

168. On October 3, 2017, Mai Dinh informed Sharlene Deskins that her emails on the Potato Board food trucks did not constitute a legal analysis.

169. On October 5, 2017, Sharlene Deskins provided Patrice Harps with a supplemental memorandum on the Potato Board's plans and again

26

warned the Agency that it was in violation of the Anti-deficiency laws and the IRS code.

170.  On October 10, 2017, Mai Dinh acknowledged that Ms. Deskins had performance expectations at a Team Leader meeting.

171.  On October 10, 2017, Sharlene Deskins was issued a reprimand for requesting to video a performance meeting that her union representative could not attend.

172.  On October 11, 2017, Mai Dinh sent an email to Sharlene Deskins alleging failure to meet expectations on the Potato Board memorandum.

173.  In addition, Ms. Dinh made a number of other unjustified criticisms of Ms. Deskins' performance, which she alleged did not meet expectations.

174.  On October 12, 2017, Sharlene Deskins responded to Mai Dinh's email regarding her alleged failure to meet expectations.

175.  On October 31, 2017, Mai Dinh and Carrie Ricci issued an unsatisfactory Performance Appraisal to Sharlene Deskins. Contrary to Ms. Dinh and Ms. Ricci's assertions, Ms. Deskins' performance under the PIP was at all times satisfactory or better in accordance with the performance requirements in the CBA.

176.  Despite her supervisors' assurance that attendance at biweekly meetings was voluntary and their agreement to provide feedback in writing,

27

Ms. Deskins was criticized in the proposed removal for not attending biweekly meetings.

177. Ms. Deskins was willing to attend the meetings had she been allowed to bring her union representative but declined to do so alone out of fear due to the hostile and confrontational manner of Ms. Dinh and her other supervisors.

178. Ms. Deskins was the OGC attorney assigned to the case of In re Stark.

179. On or about November 1, 2017, Ms. Deskins reported to tne attorney supervising her on the case, Sheila Novak, about witness availability in the In re Stark hearing.

180. Ms. Deskins informed Ms. Novak that a key witness, Juan Arango, was not available to testify at the In re Stark hearing. Mr. Arango was in Puerto Rico.

181. In the prehearing conference, the administrative judge in the In re Stark hearing had inquired about the possibility of Mr. Arango's testifying by video.

182. However, Mr. Arango was not able to do so because there was no electricity on much of the island as a result of Hurricane Maria.

183. Having determined that video testimony was not an option, Ms. Deskins did not see a need to raise the issue with Ms. Novak when Ms. Deskins reported to her regarding the availability of witnesses in the case.

184.   On November 3, 2017, Sheila Novak falsely accused Ms. Deskins of concealing the fact that the judge had inquired about video testimony, whereas in fact, Ms. Deskins had simply not discussed the issue because it had already been resolved.

185.   Mai Dinh followed up with an email to Ms. Deskins criticizing Ms. Deskins' performance and accusing her of misleading Sheila Novak about Mr. Arango's video availability for the Stark hearing.

186.   On or about November 2017, AMS sent a number of questions regarding the Federal Register to Patrice Harps, and Ms. Harps asked Ms. Deskins to address them.

187.   Ms. Deskins asked AMS to clarify what they were asking for, but AMS did not respond.

188.   On November 7, 2017, Sharlene Deskins sent Patrice Harps an email regarding AMS's failure to respond to her request for further information about its questions regarding clarification.

189.   However, rather than acknowledging that her own unclear instructions and AMS's lack of cooperation had made it impossible to provide a clear answer to the questions, Ms. Harps simply blamed Ms. Deskins once more.

190.   On November 8, 2017, Mai Dinh sent Sharlene Deskins an email regarding Ms. Deskins' assignment to clarify the _Federal Register_ language.

191.    On November 8, 2017, Ms. Dinh also sent Ms. Deskins another email purporting to give her performance feedback.

192.    On November 9, 2017, Patrice Harps requested by email that Ms. Deskins provide a more detailed explanation of the distinction between a regulation and an order.

193.    On November 13, 2017, Sharlene Deskins sent Patrice Harps and Mai Dinh an email protesting that they had again failed to give her clear instructions regarding their questions about the Federal Register.

194.    On December 7, 2017, Mai Dinh issued the Agency's first notice of proposed removal of Sharlene Deskins.

195.    On December 26. 2017. The Agency's EEO office issued its acceptance letter including Ms. Deskins amendments in USDA Complaint No. DEPT-2017-00535, Ms. Deskins' second EEO complaint, in which it accepted additional claims of discrimination and retaliation.

196.    On January 5, 2018, Sharlene Deskins submitted her first response to the Agency's first notice of proposed removal.

197.    On January 11, 2018, Mai Dinh rescinded the Agency's first notice of proposed removal of Sharlene Deskins.

198.    On January 11, 2018, Mai Dinh issued the second notice of Sharlene Deskins' proposed removal.

199.    On January 11, 2018, Mai Dinh alleged in the Notice of Proposed Removal that Ms. Deskins failed to keep her informed of the

30

progress of the In re Summer Wind settlement discussions, and that Ms. Dinh settled the case instead.

200. Mai Dinh also alleged that Sharlene Deskins had failed to adequately analyze the Potato Board's plan to form a Limited Liability Company in order to report the income earned by the food trucks to the IRS.

201. As Ms. Dinh conceded, Ms. Deskins in fact provided three memoranda indicating that the Potato Board did not have the requisite legal authority to operate an LLC, that AMS might be in violation of the Anti-Deficiency Act, and that the Potato Board's possible misuse of assessments should be investigated by USDA OIG.

202. On February 2, 2018, Sharlene Deskins submitted her Written Response to the Second Proposed Removal.

203. In her written response, Ms. Deskins again raised concerns about violations of the Anti-deficiency Laws.

204. On February 12, 2018, John Vos held an oral conference at which Sharlene Deskins was able to respond to her proposed removal.

205. On March 14, 2018, John Vos issued the Agency's Decision on Proposed Removal.

206. On March 16, 2018, The Agency removed Sharlene Deskins from federal service.

207. The Agency continued to retaliate against Ms. Deskins by refusing to ship her personal belongings to her home. Ms. Deskins did not

receive her personal items because the Agency shipped them through UPS without notifying her. UPS would not deliver the items without a signature.

208. Because Ms. Deskins was not home, UPS shipped the items back to USDA. USDA refused to reship the items and demanded that Ms. Deskins pick them up in person.

209. USDA started in June of 2018 to demand that Ms. Deskins pick up her items or the items would be disposed of by USDA.

210. On August 28, 2018, an attorney for USDA produced a picture of Ms. Deskins items on a loading docket with a sign on the items indicating that she had been fired.

211. Through September to October of 2018 , USDA demanded that Ms. Deskins come to the building to pick up her items.

212. Because Ms. Deskins had concerns about her safety, she had to hire a moving company to pick up her items because USDA would not ship them to her and threatened to destroy them.


## CLAIMS

### Count I

213. Based on the facts described in the preceding paragraphs, Defendant USDA unlawfully retaliated against Plaintiff Sharlene Deskins *when it removed her from federal service in retaliation for her protected EEO activity in violation of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.*

### Count II

214.   Based on the facts described in the preceding paragraphs, Defendant USDA unlawfully discriminated against Plaintiff Sharlene Deskins when it removed her from federal service in on the basis of her race in violation of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*

### Count III

215.   Based on the facts described in the preceding paragraphs, Defendant USDA unlawfully discriminated against Plaintiff Sharlene Deskins when it removed her from federal service in on the basis of her sex in violation of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*

### Count IV

216.   Based on the facts described in the preceding paragraphs, Defendant USDA unlawfully committed a Prohibited Personnel Act in violation of 5 U.S.C. § 2302(b)(8) against Plaintiff Sharlene Deskins when it removed her from federal service on the basis of her protected disclosure of activity in the form of potential violations of the Anti-deficiency Act and the IRS Code that she reasonably believed to be unlawful.

### Count V

217.   Based on the facts described in the preceding paragraphs, Defendant USDA unlawfully retaliated against Plaintiff Sharlene Deskins when it suspended her in November 2015 on the basis of her protected EEO activity in violation of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*

33

## Count VI

218.    Based on the facts described in the preceding paragraphs, Defendant USDA unlawfully discriminated against Plaintiff Sharlene Deskins when it suspended her in November 2015 on the basis of her race in violation of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*

## Count VII

219.    Based on the facts described in the preceding paragraphs, Defendant USDA unlawfully discriminated against Plaintiff Sharlene Deskins when it suspended her in November 2015 on the basis of her sex in violation of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*

## Count VIII

220.    Based on the facts described in the preceding paragraphs, Defendant USDA unlawfully retaliated against Plaintiff Sharlene Deskins when it suspended her in June 2017 on the basis of her protected EEO activity in violation of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*

## Count IX

221.    Based on the facts described in the preceding paragraphs, Defendant USDA unlawfully discriminated against Plaintiff Sharlene Deskins when it suspended her in June 2017 on the basis of her race in violation of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*

## Count X

222.   Based on the facts described in the preceding paragraphs, Defendant USDA unlawfully discriminated against Plaintiff Sharlene Deskins when it suspended her in June 2017 on the basis of her sex in violation of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* .

## Count XI

223.   Based on the facts described in the preceding paragraphs, Defendant USDA subjected Plaintiff to harassment and a hostile work environment on the basis of her protected EEO activity in violation of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*

## *Count XII*

224.   Based on the facts described in the preceding paragraphs, Defendant USDA subjected Plaintiff to harassment and a hostile work environment on the basis of her race in violation of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*

## Count XIII

225.   Based on the facts described in the preceding paragraphs, Defendant USDA subjected Plaintiff to harassment and a hostile work environment on the basis of her sex in violation of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*

**RELIEF REQUESTED**

226.  Plaintiff hereby requests any and all relief available pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.*, the Age Discrimination in Employment Act, 29 U.S.C. § 633a *et seq.*, the Whistleblower Protection Act and the Whistleblower Protection Enhancement Act, 5 U.S.C. § 2302(b)(8), and any other applicable federal law *or regulation prohibiting unlawful discrimination and retaliation for* protected EEO activity or whistleblower complaints, including but not limited to the following:

a.  Reinstatement with full back pay, with interest, and benefits to the earliest date that discrimination or retaliation is found.

b.  The maximum compensatory damages available by law.

c.  Restoration of any and all leave to which Plaintiff is entitled.

d.  A clean record, including but not limited to reversal and *expunction of all disciplinary actions and correction of all* unsatisfactory performance appraisals to reflect satisfactory performance, with expunction of all negative comments.

e.  Posting of notices at the Agency that the Agency has engaged in unlawful discrimination and retaliation.

f.  The reasonable attorney fees, costs, and expenses of bringing this complaint.

g.    Any other relief in law or equity that the Court may deem just and proper.

## JURY DEMAND

227.   Plaintiff requests trial by jury on all issues triable to a jury.

SHARLENE DESKINS
P.O. Box 1401
Greenbelt, MD 20706
(703) 675-5709
sharlenedeskins@gmail.com
Plaintiff pro se


December 31, 2018

37